FILED

2010 Sep-30  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

|   |   |   |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV 09-BE-2423-E** |
| | ] | |
| **JAMES J. STRICKER; et al,** | ] | |
| **Defendants.** | ] | |

**MEMORANDUM OPINION**
**GRANTING CERTAIN DEFENDANTS' MOTIONS TO DISMISS**

In this case, the United States seeks from attorneys and corporations reimbursement of Medicare benefits the Government paid to individuals who participated in a 2003 class tort settlement with Monsanto and other chemical companies involving PCB contamination in Anniston, Alabama. This matter comes before the court on the Plaintiff's "The United States' Motion for Partial Summary Judgment on Liability" (doc. 23) and six motions to dismiss by certain Defendants filed as follows: "Defendant Monsanto Company's Motion to Dismiss" (doc. 31); "Motion to Dismiss on Behalf of Defendant of Solutia Inc." (doc. 35); "Motion to Dismiss" (doc. 37) filed by Defendant Pharmacia Corporation; "Motion of Defendants James J. Stricker, Daniel R. Benson, Donald W. Stewart, and Kasowitz, Benson, Torres and Friedman LLP to Dismiss the Complaint" (doc. 40); "Motion to Dismiss" (doc. 46) filed by Defendants Don Barrett, The Barrett Law Firm, PA, Charles E. Fell, Jr., Charles Cunningham, Jr., and Cunningham & Fell, PLLC; and "Defendants American International Group, Inc.'s and the Travelers Companies, Inc.'s Motion to Dismiss Counts III and IV" (doc. 66). The motions to dismiss argue primarily that the Plaintiff's claims should be time-barred by the applicable statute of limitations, among other defenses.

The court held an extensive hearing on Monday, September 13, 2010, which addressed the issues and arguments presented in the motions to dismiss.  For the reasons stated on the Record and elaborated below, the court finds that the longest applicable statute of limitations of six years has expired prior to December 1, 2009, when the Government filed this suit; therefore, the claims against these Defendants are barred by the statute of limitations.  Accordingly, the court simultaneously will enter an Order dismissing the Plaintiff's claims as to the Defendants who filed motions to dismiss.[1]

## I.  Factual Background

This case stems from a famous set of facts.  From 1929 to 1971, Monsanto Company and its predecessors—including Solutia, Inc. and Pharmacia Corporation—produced polychlorinated biphenyls ("PCBs") at a chemical manufacturing plant about one mile west of downtown Anniston, Alabama.  In addition to environmental hazards identified from PCB emissions, the United States Environmental Protection Agency has found PCB exposure to cause health dangers such as cancer, decreased fertility, still births, and potential birth defects.

As a result, tort litigation erupted across Alabama.  Thousands of plaintiffs filed toxic-tort actions against Monsanto Company and its corporate predecessors, alleging a range of harms caused by the release of PCBs near Anniston.  Multiple cases were filed in state and federal court, beginning in 1996.  Plaintiffs sought compensatory and punitive damages for personal injury and property damage.  Because of the mass scale of litigation, many cases were consolidated in their respective state or federal courts.  Significant to this present litigation is the "global settlement" of $300 million

---

[1] Not all Defendants filed motions to dismiss.  The court does not presume to know why, but without information before it concerning the precise nature of the claims against those Defendants, the court cannot determine when those claims may have accrued for application of the statute of limitations.  Accordingly, the decision set forth in this Memorandum Opinion and accompanying Order does not apply to those Defendants.

that was reached and announced in a historic joint session of federal district court and state circuit court on August 20, 2003, resolving the consolidated cases *Tolbert v. Monsanto Co.*, CV-01-C-1407-S (N.D. Ala.) and *Abernathy v. Monsanto Co.*, No. CV-01-832 (Circuit Court of Etowah County, Ala.).   As explained by then-Chief Judge Clemons during the settlement hearing, the named plaintiffs in those cases represented a combined total of more than 20,500 people.   *See* Tr. of Proceedings, CV-01-C-1407-S, Doc. 58-1.  Professor Eric Green guided negotiations to reach the $300 million settlement, which has become known and referred to as the "*Abernathy* Settlement."

On August 26, 2003, one week following the public announcement of the *Abernathy* Settlement, Solutia, Pharmacia, and Monsanto transferred by wire the initial $75 million settlement payment into a settlement account established by the Circuit Court of Calhoun County.   *See* Settlement Agmt., Doc. 77-1.  On September 9, 2003, the parties formalized and executed a twenty-page Settlement Agreement.  The next day, on September 10, 2003, Judge Laird of the Calhoun County Circuit Court entered an order approving the terms of the Settlement Agreement.  A week later, on September 17, 2003, $200 million was transferred to the court-established settlement account under the terms of the Settlement Agreement.   The terms of the Settlement Agreement provide for the remainder of the settlement funds to be paid in annual $2,500,000 installments from 2004 through 2013.  Settlement Agmt. ¶ 1.b & 1.c.

While $275 million of the $300 million settlement was deposited into the court registry by mid-September 2003, the Settlement Agreement provided specific terms concerning distribution of those funds as allocated to the individual plaintiffs.  On October 28, 2003, the *Abernathy* plaintiffs' counsel filed a certification that seventy-five percent of the adult plaintiffs had signed releases required by the terms of the Settlement Agreement, and requested transfer of the $275 million to the

3

court-approved trust account held by the law firm of Kasowitz, Benson, Torres & Friedman LLP. Further, on December 2, 2003 the *Abernathy* plaintiffs' counsel filed a certification that the last remaining condition for distribution had been met; namely, that they had obtained court approval of settlement of the claims involving minors and that at least ninety-seven percent of the total plaintiffs had signed releases.  *See* Doc. 77-2.  For ease of reference, the court will refer to these certifications as the "75% Certificate" and the "97% Certificate," respectively.

With articles spanning pages across widely disseminated publications such as *The Washington Post*,[2] *The New York Times*,[3] *The Wall Street Journal*,[4] the *San Francisco Chronicle*,[5] the *Atlanta Journal and Constitution*,[6] the *St. Louis Post-Dispatch*,[7] *The National Law Journal*,[8]

---

[2] *E.g.*, Michael Grunwald, *Monsanto Hid Decades of Pollution; PCBs Drenched Ala. Town, But No One Was Ever Told*, Wash. Post, Jan. 1, 2002, at A1.

[3] *E.g.*, David Firestone, *Alabama Jury Says Monsanto Polluted Town*, N.Y. Times, Feb. 23, 2002 at A11; *$700 Million Settlement in Alabama PCB Lawsuit*, N.Y. Times, Aug. 21, 2003, *available at* http://www.nytimes.com/2003/08/21/business/700-million-settlement-in-alabama-pcb-lawsuit.html?ref=monsanto_company.

[4] *E.g.*, Thaddeus Herrick & Scott Kilman, *Solutia, Monsanto Agree to Pay $600 Million to Settle PCB Claims*, Wall St. J., Aug. 21, 2003.

[5] *E.g.*, Michael Grunwald, *Jury finds Monsanto liable for releasing tons of PCB–Firm covered up pollution for more than 40 years*, San Fran. Chron., Feb. 23, 2002, at A7.

[6] *E.g.*, Charles Seabrook, *$700 Million Deal on Anniston PCBs*, Atlanta J. & Const., Aug. 21, 2003, at A1.

[7] *E.g.*, Rachel Melcer, *New Claims Come Out of PCB Case: Lawyers Sue Monsanto, Solutia for Millions in Alabama Contamination*, Nov. 13, 2003, at B1.

[8] Elizabeth Amon, *Monsanto's PCB Woes: Thousands Take Company to Court*, Nat'l L. J., Feb. 11, 2002, at A1, Col. 2.

*People* Magazine,[9] and multiple reports airing on NPR,[10] no one could characterize *Abernathy* mass

tort litigation and the multi-million dollar settlement as "quiet."  Even the Alabama Supreme Court

referenced the media frenzy in its 2001 ruling on a writ of mandamus requesting change of venue

in the consolidated state court proceedings against Monsanto, stating "we are concerned about the

potential bias created by the numerous newspaper articles and the extensive television news coverage

of this case . . . ."  *Ex parte Monsanto Co.*, 794 So. 2d 350, 355 (Ala. 2001).  Still today, the PCB-

related legal drama continues to liven the courtroom.

In this case, the Government alleges that some unnamed 907 recipients of settlement funds

from the *Abernathy* litigation also received Medicare payments for unidentified medical expenses

related to the injuries or illnesses caused by the PCB contamination.  More than fourteen years since

litigation was initiated against Monsanto, the Government filed this lawsuit on December 1, 2009,

seeking to recover reimbursement for its Medicare payments from the corporate tortfeasors named

in the *Abernathy* litigation, their insurance carriers and subsidiaries, and certain attorneys who

represented the *Abernathy* plaintiffs and allegedly received the settlement funds.  The Government

did not sue any of the alleged Medicare beneficiaries as defendants to this recovery action or identify

them in pleadings.

Certain issues raised by the motions to dismiss require the court to conduct a separate legal

analysis as to the different types of defendants sued in this case.  The court identifies at least two

---

[9] Bill Hewitt, *Living on Poisoned Ground*, People, Mar. 25, 2002, *available at* http://www.people.com/people/archive/article/0,,20136662,00.html.

[10] *E.g.*, *Profile: Alabama Community that claims PCBs manufactured by Monsanto years ago has caused serious damage to personal health and property values*, NPR *Morning Edition* (Jan. 11, 2002); *Analysis: Federal regulators reach deal for the cleanup of a site contaminated by PCBs in Alabama*, NPR *All Things Considered* (Mar. 25, 2002).

distinct categories of defendants: (1) the attorneys who were involved in some capacity as representing the *Abernathy* plaintiffs; and (2) the chemical companies sued in *Abernathy* as the alleged tortfeasor defendants, including their liability insurance carriers (and their subsidiaries) who are joined as Defendants in this case.[11]   For ease of reference, the court will refer to the two categories as the "Attorney Defendants" and the "Corporate Defendants," or sometimes "tortfeasor defendants," respectively.

## II.  Issues Before the Court

Though not unanimous in the details, Defendants have filed multiple motions to dismiss asserting various theories.  A defense common to all asserts that the case is barred by the statute of limitations.  Because the court's ruling on this issue effectively resolves the case, the court does not address the alternative and supplementary dismissal theories presented.

As raised in the briefs of the parties regarding the motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must resolve several key issues.  First, the court must determine the applicable statute of limitations to the Government's causes of action.  Second, the court must determine the appropriate time of accrual concerning the causes of action.  To resolve these issues, the court finds it must analyze these questions separately as to the two categories of defendants defined above—the Attorney Defendants and the Corporate Defendants.

---

[11]   The Government's Amended Complaint, filed May 26, 2010 added certain subsidiaries of the insurance company Defendants.  (Doc. 77.)  The court entered an Order on June 9, 2010 finding that the motion to dismiss and briefing previously filed by Defendants American International Group, Inc. and The Travelers Companies, Inc. are deemed applicable to the Newly Added Defendants and relieved those parties from filing additional individual motions to dismiss in response to the Amended Complaint.  (Doc. 86.)

### III.  Standard of Review

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint.  Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)).  A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47).

Rule 12(b)(6) can also provide the appropriate vessel for evaluating a motion to dismiss based on running of the statute of limitations.  *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984) ("[A] complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint."); *see, e.g., Mann v. Adams Realty Co.*, 556 F.2d 293 (5th Cir. 1977).

In evaluating a motion to dismiss, the court assumes that all factual allegations set forth in the complaint are true, *United States v. Gaubert*, 499 U.S. 315, 327 (1991), and construes all factual allegations in the light most favorable to the plaintiff.  *Brower v. County of Inyo*, 489 U.S. 593, 598 (1989).  In other words, "[o]n a motion to dismiss, the facts stated in the . . . complaint and all reasonable inferences therefrom are taken as true." *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006) (quoting *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990)).

## IV.  Legal Background

*A.  MSPA Generally*

The law and statutes implicated by this case involve the common situation of a personal injury or illness giving rise to the need for payment of medical expenses.  Medicare provides a government payment scheme to fund medical expenses for qualified individuals.  *See* 42 U.S.C. §§ 1395-1395ggg.  In general terms, Medicare will not pay for medical expenses where  a reasonable certainty exists that an insurance company, or another liable third party, will cover the costs.  *See generally Rybicki v. Hartley*, 792 F.2d 260, 262 (1st Cir. 1986).  In cases of uncertainty, however, or where the injured or ill person is not likely to receive prompt payment for medical expenses, Medicare may make payment for the expenses conditioned upon later reimbursement.

Though it has been called "convoluted and complex" by some courts and labeled a "model of un-clarity," *Estate of Urso v. Thompson*, 309 F. Supp. 2d 253, 259 (D. Conn. 2004), the Medicare Secondary Payer Act ("MSPA" or the "MSP statute"), put simply, is a statutory reimbursement mechanism for the Government to recover expenses conditionally paid by Medicare.  *See* 42 U.S.C. § 1395y.  The history and purpose of the MSPA "plainly indicate that Congress wanted Medicare's payments to be secondary and subject to recoupment in all situations where one of the statutorily enumerated sources of primary coverage [termed 'primary payers'] could pay instead." *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 888 (11th Cir. 2003).  As the Eleventh Circuit noted,

> In a nutshell, the MSP declares that, under certain conditions, Medicare will be the secondary rather than primary payer for its insureds.  Consequently, Medicare is empowered to recoup from the rightful primary payer (or from the recipient of such payment) if Medicare pays for a service that was, or should have been, covered by the primary insurer.  Although the statute is structurally complex—a complexity that has produced considerable confusion among courts attempting to construe it—the MSP's function is straightforward.

*Id.* at 875.  Those "certain conditions" that must be met for the Government to file a claim against a "primary payer" for reimbursement under the MSPA are fleshed out by the statute's implementing regulations at 42 C.F.R. § 411.20 *et seq.*

As relevant here, any recipient of a payment that qualifies as reimbursable to Medicare under the MSPA must reimburse Medicare within sixty days.  42 C.F.R. § 411.22(a), 411.24(h) (2006).  If Medicare does not receive timely reimbursement, the Government, as it has done here, may file a lawsuit for recovery against any entity that qualifies as a "primary payer."  42 C.F.R. § 411.24(e) ("[The Government] has a direct right of action to recover from any primary payer.").  Though the MSPA does not reference "primary payer" within the text of the statute itself, the term is defined in the regulations as follows:

> Primary payer means, when used in the context in which Medicare is the secondary payer, *any entity that is or was required or responsible to make payment* with respect to an item or service (or any portion thereof) *under a primary plan*.  These entities include, but are not limited to, insurers or self-insurers, third party administrators, and all employers that sponsor or contribute to group health plans or large group health plans.

42 C.F.R. § 411.21 (emphasis added).  Responsibility to pay under a "primary plan," therefore, is an integral part of the analysis as to whether an entity qualifies as a "primary payer."

The MSPA defines "primary plan" as follows:  "A primary plan, and an entity that receives payment from a primary plan, shall reimburse [Medicare] for any payment made . . . with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."  42 U.S.C. § 1395y(b)(2)(B)(ii).  The 2004 amendments to the MSPA clarified the scope of third-party liability in the context of a "self-insured plan":  "An entity that engages in a business, trade, or profession shall be deemed to have a self-

insured plan if it carries its own risk (whether by failure to obtain insurance, or otherwise) in whole or in part." *Id.* Thus, a "primary payer" with responsibility to make payments under a "primary plan," is ultimately responsible to reimburse Medicare for its payments toward the same item or service rendered.

The MSPA regulations also clarify the Government's direct right of action to recover "from parties that *receive* primary payments," including "any entity, including a beneficiary, provider, supplier, physician, *attorney*, State agency or private insurer that has received a third party payment." 42 C.F.R. § 411.24(g) (emphases added). This provision and others indicate how the MSPA contemplates that a settlement scenario—in this case, arising from tort litigation—could qualify as a primary payment falling within the scope of liability for Medicare reimbursement. Section 411.22(b) specifically lists a "judgment," "settlement," or an "award" as examples of the nonexhausive means which may demonstrate "responsibility for payment" by a primary payer, ultimately triggering the obligation to reimburse Medicare.

Important to accrual analysis of the statute of limitations discussed below, the regulations define the Government's right to initiate recovery as beginning "as soon as it learns that payment has been made or could be made under workers' compensation, any liability or no-fault insurance, or an employer group health plan." 42 C.F.R. § 411.24(b).

For the sole purpose of analysis on the statute of limitations at issue, the court will assume that all Corporate Defendants qualify as "primary plans" under the 2004 amended definition of "primary plan" in the MSPA and will further assume no issue concerning retroactive application of these amendments. The court will also assume that the Attorney Defendants are entities that have "received payment from a primary plan or from the proceeds of a primary plan's payment to any

entity" under the MSPA, notwithstanding the argument of certain Attorney Defendants that they received only attorneys fees for their early involvement and were not involved in the settlement process.

### B. Statute of Limitations

Because the MSPA is silent as to a deadline for filing a claim for recovery, the parties agree that the relevant statute of limitations for the Government's claims, if any, is governed by the Federal Claims Collection Act ("FCCA").  28 U.S.C. § 2415 (2008); *see also In re Dow Corning*, 250 B.R. 298, 350-51 (Bktrpcy. E.D. Mich. 2000) (stating the universal recognition of FCCA's applicability to the Government's MSPA claims).  The parties disagree, however, as to whether the FCAA's six-year or three-year statute of limitations applies.

Subsection (a) of the FCAA provides that "every action for money damages brought by the United States . . . *which is founded upon any contract* express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action first accrues . . . ." 28 U.S.C. § 2415(a) (emphasis added).  Subsection (b) states that "every action for money damages brought by the United States . . . *which is founded upon a tort* shall be barred unless the complaint is filed within three years after the right of action first accrues . . . ."  28 U.S.C. § 2415(b) (emphasis added).  The issue in the present case then becomes whether the Government's MSPA action is founded upon contract or tort.  While courts have not developed any bright line test or rote rule to govern interpretation of these sections, the court recognizes that analysis should be guided by "logic and reason."  *Cockerham v. Garvin,* 768 F.2d 784, 787 (6th Cir. 1985) (analyzing the applicability of 28 U.S.C. § 2415(a) or (b)).

Because the nature and origin of the purported relationship between the Government and the two categories of defendants differ, the court will conduct a separate analysis for each.

### 1. The Corporate Defendants

At the outset, the court notes that no precedent in the Eleventh Circuit analyzes whether the three- or six-year statute of limitations applies where the Government files MSPA claims against entities who were defendants in private mass tort litigation; neither could the parties point to a relevant case from any circuit court of appeals.  The only identified reported case that analyzes closely analogous facts in application to the statute of limitations controlling MSPA claims is *In re Dow Corning*, 250 B.R. 298 (Bktrpcy. E.D. Mich. 2000).

The Government in *Dow Corning* sought reimbursement under the MSPA from a bankrupt tort defendant involved in ongoing breast implant litigation.  To determine whether the Government's MSPA claim was founded upon a tort or a contract for the purposes of statute of limitations analysis under the FCCA, the court, using principles of logic and reason, labeled the analysis "truly elementary."  *Id.* at 352.  Finding significance in the fact the Government could identify "no contractual provision binding Dow Corning to pay for medical benefits to an implant recipient who also received medical benefits from the Government," among other reasons, the court held that the MSPA action was "founded upon tort" and thus the three-year statute of limitations applied.  *Id.* at 352-53.

Similarly here, the defendant's reimbursement duties to the Government are based solely on the MSP statute because *no express contract exists* between the Defendants and the Government. The defendant's relationship with the Government prompting liability for reimbursement under the MSPA arises only, if at all, from the defendant's tortious relationship with any potential Medicare

beneficiaries arising from allegations of reckless and negligent behavior, which prompted the $300 million settlement agreement.  Thus, under a "but for" analysis, the Corporate Defendants argue that the Government's claim against them for Medicare reimbursement is founded upon tort and the three-year bar should apply.

The Government, however, strongly argues an implied contract at law theory to establish a contractual relationship between itself and the Corporate Defendants, which can be characterized as tenuous at best.  Conceding the lack of an express contract, the Government, quoting *United States v. Weinberg,* 2002 U.S. Dist. LEXIS 12289 (E.D. Penn. 2002), argues that its claim is "*more akin to a suit for restitution than tort.*"  *Id.* at *15 (emphasis added).  While the Government emphasizes that its claim against the Corporate Defendants is not a common-law tort action and will not require direct proof of any tort elements, the language of 28 U.S.C. § 2415(b) contemplates that the three-year bar  applies to any action *founded upon* a tort—not that the action itself is a tort claim or necessarily involves proof of tort elements.

To avoid the FCCA's three-year tort bar, the Government also asserts that its right of action "stems from [its] statutory right to recover monies conditionally paid by Medicare."  Pl's Omnibus Resp., Doc. 55 at 22.  Contrary to this argument, however, the court in *Dow Corning* , applying the three-year statute of limitations, explained that "[t]he fact that the Government's rights are created by statute is not a defining or even relevant factor."  250 B.R. at 351.

The Government also cites a number of non-binding authorities that apply the six-year statute of limitations to MSPA claims on a restitution theory.  These cases are distinguishable from the present fact scenario, however, because the defendants by nature possessed some type of express contractual relationship with the Medicare beneficiary that conceivably gave the Government rights

as a third-party beneficiary. *United States v. Weinberg,* 2002 U.S. Dist. LEXIS 12289, *7-*9 (E.D. Penn. 2002) (suing attorney of Medicare beneficiary); *Brooks v. Blue Cross/Blue Shield of Fla., Inc.*, 1995 U.S. Dist. LEXIS 22124, *5-*10 (suing several insurance companies as "group health plans" under MSPA and Blue Cross "as the fiscal intermediary or administrator for the Medicare program"); *Provident Life & Accident Ins. Co. v. United States*, 740 F. Supp. 492, 496 (E.D. Tenn. 1990) (action for MSPA recovery against private insurance carrier who acted as administrator of an employer's group health care plan); *United States v. Blue Cross Blue Shield*, 726 F. Supp. 1517, 1518 (suing insurance carrier as "fiscal agent" of hospitals and physicians administering Medicare benefits).

The Government also cites to "overwhelming authority" holding that courts, in general, consistently apply the six-year statute of limitations to government suits involving cost-recovery statutes. *E.g., United States v. P/B STCO 213*, 756 F.2d 364 (5th Cir. 1985) (involving the Federal Water Pollution Control Act); *United States v. Limbs,* 524 F.2d 799 (9th Cir. 1975) (Federal Employees' Compensation Act); *United States v. Sunoco, Inc.*, 501 F. Supp. 2d 641 (E.D. Pa. 2007) (Pennsylvania Storage Tank and Spill Prevention Act). This court is not convinced of the relevance of these cases to the MSPA. That Act presents a unique statutory framework that extends jurisdiction beyond the Government's direct right of action against Medicare beneficiaries and entities in contractual privity to Medicare beneficiaries, such as health insurance carriers. Instead, the jurisdictional tentacles of the MSPA reach out to remote third-party payers whose MSPA liability arises solely on the basis of independent tort liability or some other situation not involving an intentional, preexisting contract with the Government or Medicare beneficiaries. This scenario heightens the complexity of the MSPA.

14

The Government has not cited to a single case where a court has applied the six-year statute of limitations in the situation where the defendant's responsibility for Medicare reimbursement under the MSPA claim arises solely because of that entity's liability in a tort settlement to pay plaintiffs who received a Medicare payment for items or services necessitated by the defendant's alleged tortious conduct. This court declines the opportunity to be the first to do so using the Government's implied-at-law contract theory.[12] While creative, it stretches too far beyond the bounds of logic and reason to adopt absent precedent.

The only purported contractual relationship in this scenario lies *not* between the tortfeasor defendants and the Government, but between the tortfeasor defendants and the alleged Medicare beneficiaries because of a settlement resolving allegations of tort liability. The Government concedes that the relationship between the Corporate Defendants and the alleged Medicare beneficiaries arises solely because of tort allegations (Hearing Tr. at 34), and that "but for" the settlement of the tort claims, the Government would have no MSPA claim (*id.* at 30-31). The court finds in this scenario that logic and reason compel the application of the three-year statute of limitations founded upon tort, because the Government's MSPA claims are founded upon allegations of the Corporate Defendant's tortious activity and the resulting tort settlement. In the alternative, even if the six-year statute were to apply to the Corporate Defendants, the court finds the cause of action accrued more than six years before the suit was filed, as discussed below. Regardless of which statute of limitations applies, the Government's claims against the Corporate Defendants were filed too late.

---

[12] The Government raises no alternative contract theory for why the six-year statute of limitations should apply and the court will not invent any.

### 2. The Attorney Defendants

As counsel for Attorney Defendants based their statute of limitations argument on the six-year statute founded upon contract and did not argue applicability of the three-year limitations period founded upon tort, the court need not engage in a lengthy analysis as to which statute of limitations applies to the Attorney Defendants.  The court does, however, note several points of reasoning that may distinguish these Defendants from the Corporate Defendants.

Logic suggests that the Attorney Defendants who represented the tort plaintiffs in the *Abernathy* case, the alleged Medicare beneficiaries in the instant case, essentially acted as agents pursuant to the contractual relationship between the Government and the Medicare beneficiaries. More specifically, the Attorney Defendants' obligation to pay their clients any monies allegedly owed to the Government for Medicare reimbursement, unlike that of the Corporate Defendants, arose not from any tortious conduct on behalf of the Attorney Defendants themselves but from an express contractual relationship with the Medicare beneficiaries—namely, any fee agreement or attorney-client agreement between them.  From that perspective, the Attorney Defendants' MSPA obligation is essentially founded upon a contractual obligation.

For these reasons, the grounds for statute of limitations determination as applied to the Attorney Defendants is more reasonably founded upon contract rather than tort.  The contractual nexus is clearer in this instance than as alleged against the Corporate Defendants, whose MSPA obligations ultimately arose from, and cannot be divorced from, allegations of tortious conduct.  The court, therefore, concurs that the six-year statute of limitations applies as to the Attorney Defendants.

16

### C. Accrual of Government's MSPA Action

To determine when the Government's MSPA cause of action first accrued for purposes of the statute of limitations, the court considers the point of time when the Government could have brought an independent action for Medicare reimbursement related to the *Abernathy* settlement. *See* 42 C.F.R. § 411.24(b) ("[The Government] may initiate recovery as soon as it learns that payment has been made or could be made under . . . any liability or no-fault insurance, or an employer group health plan."). Again, the court separates its analysis as to the two categories of defendants because the Government's asserts a different basis for liability for each.

### 1. Corporate Defendants

 Read together, the MSPA and its implementing regulations provide that an entity's liability for Medicare reimbursement arises upon demonstration of its *responsibility to pay* under a primary plan, including a self-insured plan. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (imposing an obligation to reimburse Government upon demonstration of "a responsibility to make payment with respect to" an item or service supplied by Medicare); (iii) (enabling the Government to bring an action under the MSPA against a primary payer that is or was "required or responsible   . . . to make payment" for a primary benefit). A primary payer's responsibility to pay may be demonstrated by a variety of means, "including but not limited to a *settlement*, award, or contractual obligation." 42 C.F.R. § 411.22(b)(3) (emphasis added). The key fact for analyzing accrual of the Government's cause of action as against the Corporate Defendants, therefore, is at what point their "responsibility to pay" arose in relation to the *Abernathy* Settlement.

In light of the facts, the court finds that the Corporate Defendants' responsibility to pay arose no later than the point of execution and court approval of the *Abernathy* Settlement Agreement. The

parties negotiated the $300 million settlement during the summer of 2003 and announced it to the world pursuant to the public joint hearing on August 20, 2003. The *Abernathy* defendants transferred the initial $75 million payment into the court registry on August 26, 2003. All parties signed the finalized 20-page Settlement Agreement on September 9, 2003, which the state court approved by order the very next day. Alabama law, which governs the Settlement Agreement, dictates that court-approved settlements are fully enforceable by law. *See* Ala. Code § 34-3-21 ("An attorney has authority to bind his client, in any action or proceeding, by an agreement in relation to such case, made in writing, or by an entry to be made on the minutes of the court."); *Beverly v. Chandler*, 564 So. 2d 922, 923 (Ala. 1990) (stating that "agreements made in settlement of litigation" are "binding on the parties"); *Contractor Success Grp., Inc. v. Serv. Thrust Org.*, 681 So. 2d 212, 215 (Ala. Civ. App. 1996) ("[O]nce a settlement agreement has been entered into, it is binding and will be summarily enforced."). On September 17, 2003, the *Abernathy* defendants transferred $200 million to the court registry pursuant to the terms of the Settlement Agreement.

Even apart from the court-enforceable executed Settlement Agreement, the court finds that the August 26 and September 17 payments reflect a demonstrated responsibility to pay. Despite these dates reflecting the accrual of its cause of action, the Government did not bring its MSPA claims until December 1, 2009.

To analyze the accrual date of its cause of action, the Government adds a curious twist to the language of the MSPA statute, arguing that the Corporate Defendants' "responsibility to pay" did not actually arise until payment was *distributed* to the *Abernathy* plaintiffs in exchange for the signed releases. Because payment was "conditioned" on certification to the state court that at least ninety-seven percent of the plaintiffs had signed release waivers, the Government argues that the

"responsibility to pay" was not ultimately established until the 97% Certificate was filed on December 2, 2003—in other words, until the condition was met. This argument directly contradicts the plain reading of the language in the MSP statute, which provides that responsibility to pay "may be demonstrated by a judgment, *a payment conditioned upon* the recipient's compromise, *waiver*, or *release* (whether or not there is a determination or admission of liability) . . . or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).

The Corporate Defendants did in fact effectuate $275 million in settlement payments in August 2003 and in September 2003. The fact these payments were "conditioned upon release" did not absolve the Corporate Defendants from their "responsibility to pay" pursuant to the language of the MSPA; to the contrary, the statute expressly contemplates these types of conditional payments as demonstrative of responsibility to pay.[13] The Government's reading of the statute, that "responsibility to pay" does not arise until all conditions are met and distribution is achieved, requires adding language to the statute that does not appear and directly contradicts its plain meaning. The court will not so expand the clear intent of Congress by adding language to the MSPA statute.

Once responsibility to pay is demonstrated, the MSPA unambiguously establishes the earliest point at which the Government could have asserted its claims for reimbursement against Monsanto and the other Corporate Defendants, as third party payers: as soon as it learned that "payment has

---

[13] The court also finds merit in the Defendants' contention that the 97% Certificate condition is akin to a condition subsequent in a contract, which would not, and did not, affect the overall enforceability of the Settlement Agreement. In this regard, the 97% Certificate was merely "a post-execution contractual condition" relating to the administrative task of *distribution*, not negating Defendants' ultimate responsibility to pay. Pharmacia Reply, Doc. 58, at 6.

been made *or could be made* under . . . any liability or no-fault insurance." 42 C.F.R. § 411.24(b)

(emphasis added).  The Government does not argue that it did not learn of the *Abernathy* Settlement

until December 2, 2003, which is the latest possible accrual date that would enable its claims filed

on December 1, 2009 to survive under the longest applicable statute of limitations.[14]  Instead, the

Government argues that "[t]he statute of limitations could not have accrued prior to December 2,

2003, for the simple reason that the government did not have a cause of action prior to that point."

Pl's Omnibus Resp., Doc. 55 at 32.

The basis for the Government's reasoning is that "*[d]istribution of settlement monies* to the

*Abernathy* plaintiffs was contingent on certification to the state court that 97 percent of the

*Abernathy* plaintiffs had signed releases, which certification occurred on December 2, 2003." *Id.*

(emphasis added).  However, the express terms of the MSPA unambiguously state that, in context,

"responsibility to make payment," which then triggers the statutory obligation to reimburse

Medicare, "may be demonstrated by a judgment, *a payment conditioned upon the recipient's*

*compromise, waiver*, or *release* (whether or not there is a determination or admission of liability)

. . . or by other means," 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).  The statute does *not*

reference an "unrestricted payment" or a "fully distributed payment" or even a "final payment."

None of the regulations hinge a defendant's obligation to pay upon distribution.  Despite the

Government's attempts to twist the reading of the statute, its terms squarely contemplate that a

---

[14] Considering the widely publicized nature of the *Abernathy* Settlement Agreement—a comprehensive 20-page document detailing the logistics of the settlement payments, including dates, times, and specific accounts—the court finds it hard to conceive a reasonable argument as to the Government's lack of knowledge about its MSPA claims at the time the settlement was executed.

payment conditioned upon release triggers a responsibility to reimburse Medicare under the MSPA, which is exactly the situation presented here.

Consequently, as to the Corporate Defendants, the court finds that the Government's cause of action accrued, *at the latest*, on September 10, 2003, when the state court approved the executed *Abernathy* Settlement Agreement and at which point Defendants' responsibility to pay was clearly established. The Government reasonably could have intervened in the *Abernathy* litigation to initiate its MSPA-related claims against the Corporate Defendants at least by September 10, 2003, if not earlier. Applying either the three- or six-year statute of limitations, the Government's right of action expired long before it filed suit on December 1, 2009.

### 2. Attorney Defendants

As to the Attorney Defendants, the court employs a different standard for analyzing the point of accrual for statute of limitations purposes because they have a different basis for liability under the MSPA as alleged "recipients" of payments owed to the Government for Medicare reimbursement. Still, the court finds the Attorney Defendants "received payment" from a primary payer, *i.e.*, the Corporate Defendants, at the latest on October 29, 2003. On that date, the court governing the *Abernathy* litigation ordered the transfer of $275 million in settlement monies from the court registry to the attorneys' escrow account.

The court finds no merit in the Government's contention that the Attorney Defendants did not actually "receive" the payment on October 29, 2003 because of the nature of the escrow account and the attorneys' inability to immediately distribute the funds. The Government argues that it could not have intervened with its MSPA claim until the filing of the 97% Certificate on December 2, 2003, which released the funds for distribution. To the contrary, the most logical and appropriate

21

time for the Government's right of reimbursement under the MSPA to be honored would have been at the time of initial transfer of the settlement funds into the attorneys' escrow account, if not earlier. At that time, a court could have determined proper distribution of those funds as allocated to the plaintiffs, to vendors, to attorneys for legal fees, and to any parties with subrogation claims, including the Government's claim here for Medicare reimbursement.

The Government most certainly could, and should, have intervened *before* the *Abernathy* settlement monies were actually distributed to the thousands of plaintiffs. The Government's MSPA claims were, therefore, ripe for accrual *no later than* October 29, 2003, the date the Attorney Defendants received payment of the $275 million settlement monies in escrow. The court notes that in practical terms, the Government likely could have intervened at any time during the pendency of the *Abernathy* litigation, and certainly at the time the Settlement Agreement was executed and judicially approved in September 2003. To afford every possible benefit to the Government, however, the court reaches its generous conclusion that accrual of its MSPA claim occurred no later than October 29, 2003.[15]

### D. Tolling

The Government argued in brief that its MSPA claims "likely did not accrue until much later [than December 2, 2003] due to the federal tolling statute." Pl's Omnibus Resp., Doc. 55 at 33. The tolling statute on which the Government relies provides that the FCCA statute of limitations period

---

[15] The court briefly notes that at the close of the hearing on the motions to dismiss, the Government raised for the first time a theory of continuing accrual, vaguely proposing that a new MSPA cause of action accrues every year when the Corporate Defendants make additional payments to the Attorney Defendants. Because this theory was admittedly not raised in any briefs before the court and not pled in the Amended Complaint, it is not properly before the court and the court does not reach this issue.

is stopped during periods when "facts material to the right of action are not known and *reasonably could not be known* by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2146(c) (emphasis added). In the Eleventh Circuit, "once the facts making up the 'very essence of the right of action' are reasonably knowable, the § 2146 bar is dropped." *United States v. Kass*, 740 F.2d 1493, 1497 (11th Cir. 1984). The Eleventh Circuit in *Kass* explains the history and purpose of the FCCA: "The limitation period was designed to promote diligence by the government in bringing claims to trial and also to make the position of the government more nearly equal to that of a private litigant." *Id.* at 1496 (citations omitted). The court further explained:

> Although one motivation behind enacting a time limit on government-prosecuted civil actions was the desire to inspire diligence in discovering claims, Congress also intended that the government should not be penalized for excusable ignorance of such claims. Foremost in the enactment of § 2416(c) was the thought that the government should not be penalized if the *fraud* of an adverse party restricted its ability to discover a valid cause of action until long after its accrual. Cong. News at 2507 ("The committee understands that the principal application of this exclusion will probably be in connection with fraud situations.").

*Id.* at 1497 (emphasis in original).

The facts of this case do not implicate any fraudulent concealment of any related MSPA claim. Moreover, the Government has not alleged that it did not or *reasonably could not have known* the facts giving rise to its MSPA causes of action prior to December 2, 2003. While the Eleventh Circuit has not designated which party bears the burden of proving the elements of this particular federal tolling statute, "federal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings." *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (citing cases from the Ninth, Tenth, Eighth, and D.C. Circuit Courts of Appeals). Indeed, the Government would be hard pressed

to show that it reasonably could not have known of the widely reported *Abernathy* litigation, initiated in 1996, and the ensuing settlement reached in August 2003.  Rather, the Government argues the "obvious fact" that it "could not have had knowledge of its claim before that claim arose, which . . . was on December 2, 2003."  Doc. 55 at 34.  Because the court ultimately disagrees with the Government as to the accrual date of its claim, it finds no merit in this particular argument.

The Government does not suggest a time frame during which the court should consider its lack of knowledge of material facts sufficient to toll the statute of limitations, and the court declines to speculate as to such a period.  Because the court finds no reasonable or compelling argument that the Government "could not have known" of its rights to collect reimbursement related to the *Abernathy* settlement before December 2, 2003, the tolling provision does not apply to extend the Government's time period to file its MSPA claims.

## CONCLUSION

For these reasons, the court holds that the three-year statute of limitations began running against the Corporate Defendants no later than September 10, 2003, the date the executed Settlement Agreement was approved by order of the state court.  The statute of limitations, therefore, expired no later than September 10, 2006, and bars the Government's claims filed against the Corporate Defendants on December 1, 2009 as untimely.   Alternatively, under the six-year statute of limitations, the court finds that the Government's claims against the Corporate Defendants expired no later than September 10, 2009, still barring the Government's MSPA claims as untimely.

As to the Attorney Defendants, the court holds that the six-year statute of limitations began running no later than October 29, 2003, when they received the $275 million payment from the *Abernathy* settlement.  The statute of limitations, therefore, expired no later than October 17, 2009

24

and also bars the Government's claims filed against the Attorney Defendants on December 1, 2009.

Because the court reaches a resolution of the motions to dismiss on statute of limitations grounds, it does not reach the additional grounds for dismissal asserted by various Defendants.  The Government's claims as to the Defendants who filed the motions to dismiss listed in this Opinion will be dismissed; accordingly, the Plaintiff's motion for summary judgment on the question of liability will be denied.  A separate Order to this effect will be filed simultaneously.

DONE and ORDERED this 30th day of September, 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE